1
2
3
4
5
6
7

8          **UNITED STATES DISTRICT COURT**

9          **SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 15cr3175 JM |
| Plaintiff, | ORDER DENYING MOTION TO SUPPRESS DEFENDANT MEZA'S STATEMENTS; DENYING MOTION TO SUPPRESS EVIDENCE |
| v. | |
| DAVID ENRIQUE MEZA; TAYLOR MARIE LANGSTON, | |
| Defendant. | |

        Defendant David Enrique Meza ("Meza"), joined by co-defendant Taylor Marie
Langston ("Langston"), moves to suppress statements and to suppress evidence.  The
Government opposes the motion.  Having carefully considered the matters presented,
the court record, appropriate legal authorities, and the arguments of counsel, the court
denies the motion to suppress statements and denies the motion to suppress evidence.

                              **BACKGROUND**

The Indictment

        On December 22, 2015, the Government charged Meza and Langston in a 4
count indictment.  Count 1 charges Meza only with interstate or foreign domestic
violence resulting in death in violation of 18 U.S.C. §2261(a)(1).  Count 2 charges
both Meza and Langston with conspiracy to obstruct justice by impeding an official
proceeding in violation of 18 U.S.C. §§1512(c)(2) and (k).  Count 3 charges Langston
only with obstruction of justice for lying to an FBI agent about her and Meza's

presence at a friend's house in Tijuana in violation of 18 U.S.C. §§1512(c)(2).  Count 4 charges Langston only with making a false statement to an FBI agent in violation of 18 U.S.C. §1001.

The Crimes Charged

The Government proffers that Meza is allegedly a male prostitute and adult film actor.  In 2013 a wealthy Texan named Jake Merendino became one of Meza's customers.  Meza and Merendino carried out a relationship over the following years. Merendino desired to leave Texas and retire in Mexico.  In late 2014 and 2015, Meza and Merendino searched properties to buy in Baja California.  Merendino decided to buy a $300,000 condo in Rosarito and, on the closing documents, identified Meza as the beneficiary in case of death.  By April 2015, Langston, Meza's fiance, was 9 months pregnant.

Two days after closing on the condo, on May 1, 2015, Meza and Merendino checked into a hotel in Rosarito because the new condo was not ready for habitation. They arrived in separate vehicles - Meza on a motorcycle and Merendino in a Range Rover.  Meza then returned to San Diego to meet with Langston.  In the early morning hours of May 2nd, Meza and Langston went to Mexico - Meza driving the motorcycle, and Langston an SUV.

At 2:00 a.m., Meza called Merendino at the hotel and told him his motorcycle had broken down.  Merendino drove to assist Meza.  Once Merendino arrived at the site, Meza allegedly stabbed him to death.  Meza and Langston crossed back into the U.S. at about 4:00 a.m.

A few days later, Meza called a friend in Mexico and allegedly asked him to create a false alibi for him and Langston.  The friend was told to tell any investigators that he was with Meza and Langston on the date of the murder.  On May 18, 2015, Meza sought to probate a holographic will in Texas, naming himself as the sole beneficiary of the Merendino estate.

15cr3175

<u>The Search and Interviews</u>

On June 4, 2015, federal agents executed a search warrant at Meza's apartment. At that time, Meza made the statements subject to the present motion to suppress statements.  When armed San Diego Police Detective ("SDPD") James Brown, FBI Agent Benjamin Inman, and five other agents arrived at the apartment, Meza answered the door in his underwear.  He was handcuffed and escorted outside until the apartment was cleared.  Within a few minutes, and once the apartment was "cleared," Agent Inman brought a T-shirt and pair of jeans to Meza.  Approximately 5 - 10 minutes later, SDPD Brown approached Meza, without his raid jacket, gun, or visible badge.  SDPD Brown told Meza that he wanted to talk with him, and asked the FBI to remove the handcuffs.  After assisting Meza with his clothing, SDPD Brown suggested that they speak in a car, an unmarked car parked about 1/4 block away.  SDPD Brown unlocked the car and Meza sat in the passenger seat.  SDPD Brown started the car for the air conditioning.  He did not lock the doors nor drive away.  SDPD Brown's partner, Detective Van Houten was seated in the back of the vehicle.

SDPD Brown provided Meza with the Miranda advisements.  Meza argues that the warnings were ineffectual because they were "swallowed," not clearly intelligible, and failed to inform Meza that he could stop the interview at any time.

During the interview of approximately four hours, Meza at first told SDPD Brown and Van Houten that he earned a living by working at the Navy Exchange and by doing construction work, he met Merendino by chance, and his relationship with him was not romantic or sexual.  He also stated that he was not in Mexico on the day of Merendino's murder.  As SDPD Brown continued his interrogation, Meza admitted that he was a male prostitute and had a romantic and sexual relationship with Merendino.  He stated that he lured Merendino to the side of the road but did not kill him.  He intended only to steal some stereo equipment.  He left Merendino alive on the side of the road.

15cr3175

1  **The Motion to Suppress Statements**

2       Custodial Interrogation

3       Meza argues that he was in custody at the time of his June 4th interview and,

4  therefore, entitled to receive the Miranda advisements.  The Government argues that

5  Meza was not in custody.

6       The Miranda warnings must be provided to an interviewee who is "in custody."

7  Thompson v. Keohane, 516 U.S. 99, 102 (1995).  An individual is in custody for

8  Miranda purposes when the suspect has been "deprived of his freedom of action in any

9  significant way."  United States v. Craighead, 539 F.3d 1073, 1082 (9th Cir. 2008)

10  (quoting Miranda v. Arizona, 384 U.S. 436, 444 (1966)).  Such a deprivation occurs

11  when the "suspect's freedom of action is curtailed to a 'degree associated with formal

12  arrest.'" Berkemer v. McCarty, 468 U.S. 420, 440 (1984) (citation omitted).  The

13  analysis of the circumstances of the deprivation "is an objective one; [the court asks]

14  whether 'a reasonable [person] in the suspects's position would have understood his

15  situation . . . as the functional equivalent of formal arrest.'" United States v. Revels,

16  510 F.3d 1269, 1273 (10th Cir. 2007) (quoting Berkemer, 468 U.S. at 442).  "Whether

17  a suspect is in custody turns on whether there is a 'formal arrest or restraint on freedom

18  of movement of the degree associated with a formal arrest.' [Citations omitted].  This

19  inquiry requires a court "to examine the totality of the circumstances from the

20  perspective of a reasonable person in the suspect's position."  United States v.

21  Crawford, 372 F.3d 1048, 1059 (9th Cir. 2004) (en banc).

22       The test is whether a "reasonable person would have felt he or she was not at

23  liberty to terminate the interrogation and leave."  Howes v. Fields, 132 S. Ct. 1181,

24  1189 (2012) (quoting Stansbury v. California, 511 U.S. 318, 322-323 (1994)).  The

25  custodial determination, viewed from the totality of circumstances, "depends on the

26  objective circumstances of the interrogation, not on the subjective views harbored by

27  either the interrogating officers or the person being questioned." Stansbury, 511 U.S.

28  at 323.  The factors to be considered include "all the circumstances surrounding the

interrogation," including the "location of the questioning," "its duration," "statements made during the interview," "the presence or absence of physical restraints," and "the release of the interviewee at the end of the questioning." Howes, 132 S. Ct. at 1189. The Ninth Circuit has cited similar factors which are "among those likely to be relevant":

> 1) the language used to summon the individual; 2) the extent to which the defendant is confronted with evidence of guilt; 3) the physical surroundings of the interrogation; 4) the duration of the detention; and 5) the degree of pressure applied to detain the individual.

United States v. Kim, 292 F.3d 969, 974 (9th Cir. 2002).

In Craighead the Ninth Circuit adopted the "approach of using the 'police-dominated atmosphere' as the benchmark for custodial interrogation in locations outside of the police station [finding that it] is consistent with the Supreme Court's adaptions of Miranda to these types of locations." Id. at 1083. In Craighead, eight law enforcement agents from three different agencies went to the defendant's home to execute a search warrant for child pornography on Craighead's computer systems. At least five agents wore flak jackets, some had unholstered their weapons, and others were armed. SA Andrews requested to talk with Craighead and stated that he was free to leave, he was not under arrest, would not be arrested that day, and that any statement he would make would be voluntary. Two agents and Craighead then went to a small, cluttered back room. The defendant was not handcuffed. SA Andrews testified that it was her practice to tell interviewees that they were free to leave once when escorted to an interrogation location and again at the beginning of the interview. She did not specifically recall advising defendant a second time that he was "free to leave."

Craighead testified that he did not feel free to leave. In order to exit the small back room, he would have had to ask the detective to move. He also testified that "the prevailing mood of the morning" left him with the impression that he was not free to leave. He also thought that even if SA Andrews had permitted him to leave the other officers would not have let him leave. He did not know if he needed permission from

1   all three law enforcement agencies executing the search warrant before he was allowed

2   to leave.    During the interview, Craighead confessed to downloading child

3   pornography.  He moved to suppress the statements made to SA Andrews based upon

4   the failure of SA Andrews to provide him with his <u>Miranda</u> advisements.  The district

5   court denied the motion to suppress, finding that the interview was not custodial.

6         The Ninth Circuit reversed.  The Ninth Circuit reasoned that a search of one's

7   home presents analytical challenges in light of the "uniqueness of an interrogation

8   conducted within the suspect's home." <u>Craighead</u>, 539 F.3d at 1083; <u>Wayne v. Layne</u>,

9   526 U.S. 603, 610 (1999) ("The Fourth Amendment embodies this centuries-old

10  principle of respect for the privacy of the home"); <u>Mincey v. Arizona</u>, 437 U.S. 385,

11  393 ("[T]he Fourth Amendment reflects the view of those who wrote the Bill of Rights

12  that the privacy of a person's home and property may not be totally sacrificed in the

13  name of maximum simplicity in enforcement of the criminal law").  The analysis by the

14  Ninth Circuit focused on the application of "the traditional <u>Miranda</u> inquiry to an in-

15  home interrogation." <u>Craighead</u>, 539 F.3d at 1083.   Noting that <u>Miranda</u> instructs that

16  its advisements are to be provided when a suspect is held incommunicado "in a police-

17  dominated atmosphere," <u>Miranda</u>, 384 U.S. at 445, the Ninth Circuit adopted and

18  applied a four factor test to assist the court in determining whether the police created

19  a police-dominated environment such that the suspect could not reasonably believe he

20  was free to leave.  In making this fact-intensive inquiry, the district court is to consider

21  all relevant factors including "(1) the number of law enforcement personnel and

22  whether they were armed; (2) whether the suspect was at any point restrained, either

23  by physical force or by threats; (3) whether the suspect was isolated from others; and

24  (4) whether the suspect was informed that he was free to leave or terminate the

25  interview and the context in which any such statements were made." <u>Id.</u> at 1084.

26        Applying this four factor test, the Ninth Circuit concluded that Craighead was

27  in custody for purposes of <u>Miranda</u>.  Accordingly, the failure of law enforcement to

28  provide the <u>Miranda</u>  advisements, or to communicate effectively that the suspect was

1   "free to leave," required suppression of Craighead's statements.  In applying the first

2   factor, the Ninth Circuit noted that "the presence of a large number of visibly armed

3   law enforcement officers goes a long way towards making the suspect's home a police-

4   dominated atmosphere." <u>Id.</u> at 1085.  The fact that eight armed agents arrived at

5   Craighead's home  to execute the search warrant satisfied this factor.  Second, the

6   totality of the circumstances (the presence of the agents, Craighead being escorted to

7   a back room for the interview with the door closed, an agent standing by the door, and

8   Craighead's belief that he was under guard) indicated that it was objectively reasonable

9   for Craighead to believe that his "freedom of action was restrained in a way that

10  increased the likelihood that [he] would succumb to police pressure to incriminate

11  himself." <u>Id.</u> at 1086.  Third, "isolating the suspect from family and friends is one of

12  the distinguishing features of a custodial interrogation." <u>Id.</u> at 1087. The record

13  indicated that Craighead was also isolated from other law enforcement personnel

14  during the interview.  The FBI excluded one government agent from the interview site.

15  The Ninth Circuit noted that the "FBI may exclude whomever it chooses from an

16  interrogation; <u>Miranda</u> requires that if the FBI isolates the suspect, and the suspect does

17  not reasonably believe he is free to leave, warnings must be given." <u>Id.</u> at 1087.

18  Fourth, Craighead was told that he was not under arrest, he would not be arrested that

19  day regardless of what information he provided, his statements were voluntary and he

20  was free to leave.  Despite the representations that he was free to leave, the Ninth

21  Circuit, viewing the totality of the circumstances, concluded that "a reasonable person

22  in Craighead's position would not have actually 'felt' he was free to leave." <u>Id.</u> at

23  1089.

24        Here, applying relevant factors, including those identified in  <u>Craighead</u>, the

25  court concludes that Meza's freedom of action was severely restrained by Government

26  agents such that Meza, under the totality of circumstances, was is custody and entitled

27  to receive the Miranda advisements.  At 7:00 a.m. seven armed FBI  and SDPD

28  detectives, dressed in raid jackets and with weapons drawn by several of the agents,

15cr3175

1    entered Meza's apartment by using a pry bar.  Meza, dressed in his underwear,
2    answered the door and was immediately instructed to place his hands behind his back
3    where he was handcuffed and all movement restrained.  Meza was then isolated and
4    escorted to the street.  After about five minutes, Officer Inman retrieved some clothes
5    and later removed the handcuffs when Meza was assisted in getting dressed.  The first
6    three Craighead factors favor a finding that Meza was in custody for purposes of
7    Miranda.  Meza was surrounded by a strong and overwhelming armed police presence
8    in his home, the door to his apartment was forced open with a pry bar, he was
9    handcuffed, and he was isolated from his home and fiance.

10         At this point, pursuant to a prearranged interview plan, SDPD Brown approached
11   Meza and told him that he wanted to talk.  SDPD Brown and his partner agent escorted
12   Meza to SDPD Brown's car.  SDPD Brown informed Plaintiff that he was not under
13   arrest.  Notably, there is no evidence to show that Meza was informed that he was free
14   to leave or that he could terminate the interview at any time.  Meza was then placed in
15   an enclosed unmarked automobile for four hours where he was subjected to non-stop
16   questioning, mostly by SDPD Brown who was assisted by Detective Van Houten.
17   Throughout the lengthy four-hour interview, at least one police officer remained
18   outside the vehicle at all times.  Thus, it is reasonable to conclude that Meza was not
19   free to leave.  By any measure, Meza was placed in a police dominated environment
20   which mandated that he receive the Miranda advisements.  Based upon the totality of
21   circumstances, the court concludes that Meza was in custody at the time of his
22   interview.  Meza was therefore entitled to receive the Miranda advisements.

23         In sum, Meza was entitled to receive the Miranda advisements.

24         Adequacy of the Miranda Warnings

25         The next issue is whether the Miranda advisements provided to Meza were
26   adequately conveyed and whether Meza voluntarily waived those advisements.  Before
27   a custodial interrogation may go forward, Miranda requires that the interviewee be
28   advised that he has the right to remain silent, anything he says can be used against him

1   in court, he has the right to an attorney, and one will be appointed for him if he cannot

2   afford one.  <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

3       The beginning of the taped interview sets forth a statement by SDPD Brown

4   confirming that he told Meza before the taped interview began that he was not under

5   arrest and then proceeded to tell him that he had the right to remain silent, the right to

6   an attorney during the questioning, the right to the appointment of counsel if he could

7   not afford one, and that anything he said could be used against him in court.  SDPD

8   Brown then stated:

9       Q:  "Okay.  You understand all that stuff?"

10      A: "Mm-hm."

11      Meza contends that the warnings provided were inadequate because they were

12  equivocal, ambiguous, and inaccurate.  Meza also contends that he should have

13  specifically been told he could stop the interview at any time.  These arguments are not

14  persuasive.  While the recorded conversation demonstrates that SDPD Brown used

15  colloquial language to describe the Miranda advisements, the court concludes that the

16  language used sufficiently informed Meza of his Miranda advisements.   This is not

17  like <u>Doody v. Ryan</u>, 649 F.3d 986 (9th Cir. 2011), relied upon by Meza, where the

18  agent provided a rambling, convoluted, erroneous, and detour laden recitation of the

19  Miranda advisements that took 12 pages of transcripts to cover the relatively short

20  Miranda advisements.  The Ninth Circuit concluded that the agent downplayed the

21  warnings' significance and expressly misinformed the defendant about the right to

22  counsel.

23      This case is markedly different from <u>Doody</u>.  Neither SDPD Brown nor his use

24  of colloquial language misled Meza.  Rather, the advisements effectively conveyed

25  Meza's rights as required by Miranda.  Nothing more was required.[1]

26      In sum, the court concludes that the warnings provided by SDPD Brown were

27

28      [1] The court rejects Meza's contention that SDPD Brown swallowed and
mumbled the Miranda advisements.  The recorded conversation does not support this
argument.

1    adequate to inform Meza of his Miranda rights.

2          The Miranda Waiver/Coercion/Voluntariness

3          Immediately after providing the Miranda advisements, SDPD Brown discussed
4    how another agent would be joining them and then inquired into general biographical
5    background issues.  Other than the "Mm-hm," there was no response by Meza to the
6    Miranda advisements.  After providing Meza with the Miranda advisements, Meza
7    answered questions during a four-hour period of time.

8          Meza contends that the manner in which SDPD Brown delivered the Miranda
9    warnings minimized the force of the warnings such that his response and implied
10   waiver of Miranda is not valid.  Meza also cites Miranda for the proposition that the
11   Government has a "heavy burden" to show that a waiver of Miranda is knowing
12   voluntary, and intelligent.  Meza also contends that his consent was coerced because
13   he was still under the emotional influence of the armed search at his apartment and
14   police presence.

15         In Berhuis v. Thompson, 560 U.S. 370 (2010), the Supreme Court clarified that
16   the "heavy burden" language in Miranda simply means that the Government has the
17   "burden to establish waiver [of Miranda] by a preponderance of the evidence."  Id. at
18   384.[2]  Miranda may be waived expressly or implicitly.  Berhuis makes clear that an
19   implicit waiver of Miranda may be shown where (1) the accused is provided with the
20   Miranda warnings; (2) the accused understands those advisements; and (3) the accused
21   makes uncoerced statements.  Id.  "As a general proposition, the law can presume that
22   an individual who, with a full understanding of his or her rights, acts in a manner
23   inconsistent with their exercise has made a deliberate choice to relinquish the
24   protection those rights afford."  Id. at 385.

25         Here, the court concludes that Meza waived his Miranda advisements.  From
26   Meza's  responses to the Miranda advisements, he understood those rights,  Meza

27

28         [2] The Miranda Court stated that "a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." Id. at 475.

- 10 -

1  replied "yes" or 'Hm-hm" when each warning was given to him and again when asked

2  if he understood all the rights collectively.   On the record of this case, the weight of

3  the evidence demonstrates that Meza understood each Miranda advisement and then

4  proceeded to answer questions coherently and without protest.  This is sufficient to

5  establish that he waived the Miranda advisements.

6       In sum, the court concludes that Meza voluntarily, both explicitly and implicitly,

7  waived the Miranda advisements.

8       Invocation of Miranda

9       Meza contends that he twice invoked the right to remain silent but the Agents

10  continued their questioning.   First, after some intense questioning, Meza stated, "I

11  already told you what I'm oh, what I - what happened.  What I know." (Exh. A at

12  p.129.)  Meza also stated, "I don't have anything to say.   That's - that's all.  You've

13  pretty much made me tell you everything that I - I'm not supposed to."  (Exh. A at

14  p.167).  Meza represents that these statements are sufficiently clear and unambiguous

15  such that the questioning should have immediately terminated.

16       It is well-established that an accused may invoke their right to silence and

17  terminate police questioning only by "unambiguously" invoking that right.  Berghuis,

18  560 U.S. at 381-82.  Meza's first statement, "I already told you what I'm oh, what I

19  what happened.   What I know," does not come close to a clear and unequivocal

20  invocation of the right to silence.  Rather than informing SDPD Brown that he wanted

21  to stop the interview, Meza merely stated he had "already [stated] what happened."

22  This was not an unambiguous invocation.  Rather, the statement reasonably appears to

23  be no more than a denial, or effort to withhold, further information.  This falls leagues

24  short, for example, of the clear invocation recently addressed in Jones v. Harrington,

25  2016 .D.A.R. 7446 (9th Cir. 2016) ("I don't want to talk no more, man.").

26       As for Meza's statement, "I don't have anything to say.  That's - that's all.

27  You've pretty much made me tell you everything that I - I'm not supposed to," it

28  suffers from the same invocation deficiencies.  First, the words, "pretty much," implies

1  Meza had more to tell.  Second, it suggests he was "supposed to" hold some
2  information back.  On behalf of an accomplice?  For what purpose?  Who else was
3  involved?  These were all legitimate questions an interrogator would have reasonably
4  entertained given Meza's curious and unclear statement.  Again, Meza's musing fell
5  far short of an unambiguous invocation of silence.

6  Although a suspect may selectively invoke the right to silence, see Hurd v.
7  Terhune, 619 F.3d 1080, 1085 (9th Cir. 2010), and may even limit the manner of
8  interrogation, see Arnold v. Runnels, 421 F3d. 859, 866 (9th Cir. 2005), invocation
9  may only be premised upon a statement objectively determined to be unambiguous in
10  its import that questioning cease.  It cannot, and should not, be a dodge, equivocal, a
11  mere denial of further information.

12  In sum, the court concludes that Meza did not invoke the right to remain silent.
13  **The Motion to Suppress Evidence**

14  Meza moves to suppress evidence seized from his apartment in alleged violation
15  of the warrant requirements.  He contends that the warrant was overbroad and lacked
16  specificity because, in part, the warrant authorized agents to seize "data," a vague and
17  overbroad term.  Furthermore, Meza contends that the search warrant should be limited
18  to the time period of April 29, 2015 through May 3, 2015 because these are the dates
19  referred to in the Probable Cause Statement.

20  After the initial search, Government agents asked Meza if they could reenter the
21  apartment.  He consented, verbally and in writing, that the agents could reenter the
22  apartment. The agents seized a pair of shoes and an iPad owned by Merendino.

23  The 4th Amendment requires that warrants be based upon probable cause and
24  describe with particularity the things to be seized.

25

26  In determining whether a description is sufficiently precise, we have
   concentrated on one or more of the following: (1) whether probable cause
27  exists to seize all items of a particular type described in the warrant; (2)
   whether the warrant sets out objective standards by which executing
28  officers can differentiate items subject to seizure from those which are
   not; and (3) whether the government was able to describe the items more

1   particularly in light of the information available to it at the time the
2   warrant was issued.

3   United States v. Spilotro, 800 F.2d 959, 963 (9th Cir.1986) (internal citations omitted).

4   The warrant and accompanying affidavit set forth Meza and Langston's activities

5   preceding and following the alleged killing of Merendino.  The affidavit identifies,

6   based upon Agent Van Houten's experience and training, that Defendants and

7   Merendino likely communicated via cell phone, and both Defendants possessed email

8   and other social media accounts. The application for warrant identified that the scope

9   of the data (or other electronic communications) search is limited by identifying the

10   seizure of items that (1) tend to show efforts to coordinate meeting; (2) provide links

11   to Defendants and Merendino; (3) tend to identify co-conspirators; (4) tend to identify

12   travel; (5) tend to identify the individual with control or access to the device; and (6)

13   tend to place in context the creator, recipient or establish the time of creation of the

14   date or communications.  Here, Magistrate Judge Crawford reasonably found that the

15   warrant and declarations establish probable cause to believe that relevant items would

16   be seized from electronic devices.

17   The court concludes that the warrant is not overbroad.  While the term "data,"

18   standing in isolation, may be overly broad, the warrant provides sufficient guidance to

19   government agents to limit their search to the six limitations described in the warrant.

20   Meza also contends that all electronic searches must be limited to the time period

21   between April 29 and May 3 because the warrant application generally describes events

22   occurring during this period of time.  Some of the electronic data retrieved falls outside

23   this four day period of time.  Notably, the warrant does not limit the data to be seized

24   to this limited period in time.  Rather, the data or communications are limited by the

25   six limitations described above.  In other words, the most important limitation on the

26   search is that items seized relate to the underlying crimes, and not some artificial time

27   limit.

28   / / /

1      In sum, the court denies both the motion to suppress statements and to suppress

2  evidence.

3      **IT IS SO ORDERED.**

4  DATED:  August 25, 2016

5

6      Hon. Jeffrey T. Miller
    United States District Judge

7  cc:     All parties

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

15cr3175